2007-NMCA-106

166 P.3d 480

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Joseph C. COLLINS, Defendant–
Appellant.**

No. 25,942.

Court of Appeals of New Mexico.

June 19, 2007.

Certiorari Denied, No. 30,531, Aug. 8, 2007.

Gary K. King, Attorney General, Santa Fe, NM, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Appellee.

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, NM, for Appellant.

PICKARD, Judge.

## OPINION

{1} Defendant appeals his convictions for multiple counts of securities fraud and the sale of unregistered securities, contrary to the New Mexico Securities Act of 1986, NMSA 1978, §§ 58–13B–1 to –57 (1986, as amended through 2004) (Securities Act). On appeal, Defendant raises five issues regarding (1) the district court's restitution order, (2) double jeopardy, (3) the six-month rule, (4) sufficiency of the evidence, and (5) conflict of interest. Finding no error, we affirm Defendant's convictions.

## BACKGROUND

{2} This is the third appeal to this Court involving Defendant and the criminal and administrative proceedings resulting from Defendant's osteopathic practice in Alamogordo, New Mexico. *See State v. Collins*, No. 25,941 slip op. (N.M. Ct.App. April 16, 2007); *State v. Kirby*, 2003–NMCA–074, 133 N.M. 782, 70 P.3d 772. In 1985, Defendant opened an osteopathic clinic in Alamogordo. The clinic was financed by a number of Defendant's patients, who loaned him money and were issued promissory notes in return. *Kirby*, 2003–NMCA–074, ¶ 42.

{3} Defendant and his wife filed for bankruptcy in 1998. The bankruptcy action was challenged by thirty-nine people who had loaned money to fund Defendant's clinic and who had not been repaid. The debts were eventually discharged by the bankruptcy court. In discharging the debts, the bankruptcy court found that Defendant and his wife did not misrepresent their financial condition to those who had loaned money to the clinic.

{4} Defendant's actions also became the subject of an investigation and administrative proceeding by the Securities Division of the New Mexico Regulation and Licensing De-

partment, the subject of which constituted the first of Defendant's appeals before our Court and is discussed in greater detail in *Kirby*. Defendant was also indicted on criminal charges for his conduct, and he was subsequently convicted on multiple counts of securities fraud and the sale of unregistered securities. His appeal of those convictions is the subject of this opinion.

## DISCUSSION

{5} On appeal, Defendant first argues that the criminal proceedings against him were brought as an end-run around the provisions of federal bankruptcy law, which had provided for the discharge of Defendant's debts. As such, Defendant contends that the district court erred by ordering restitution to the noteholders as part of Defendant's judgment and sentence. Second, Defendant asserts that his convictions for securities fraud for each issuance of a promissory note and for each renewal or "rollover" of existing promissory notes violated double jeopardy. Defendant's third issue on appeal is that the district court erred by denying a motion to dismiss the charges against Defendant for violation of the six-month rule under Rule 5–604 NMRA. Fourth, Defendant contends that because promissory notes are not securities or investments in a business, the evidence was insufficient to support his convictions. Lastly, Defendant argues that the district attorney's office should have been disqualified for conflict of interest and that the district court's failure to do so necessitates the reversal of his convictions. We address each issue in turn, and we affirm.

### Bankruptcy and Restitution

{6} As part of the district court's judgment and sentence, Defendant was ordered to pay restitution to the victims of his convictions. On appeal, Defendant contends that because the debts in question were previously discharged by a bankruptcy court years earlier, the district court erred by ordering restitution in the present case. We disagree.

{7} It is commonly recognized that "criminal restitution may generally be im-

**422**

posed despite a previous discharge of the underlying debts in bankruptcy[.]" *Cabla v. State,* 6 S.W.3d 543, 550 (Tex.Crim.App.1999) (Meyers, J., concurring). Indeed, our Court in *State v. Muzio,* 105 N.M. 352, 355, 732 P.2d 879, 882 (Ct.App.1987), recognized this very principle. In *Muzio,* the defendant passed a number of bad checks and subsequently filed for bankruptcy. *Id.* at 353, 732 P.2d at 880. The State then initiated criminal proceedings against the defendant under the Worthless Check Act, NMSA 1978, §§ 30–36–1 to –10 (1963, as amended through 1984). *Muzio,* 105 N.M. at 353, 732 P.2d at 880. The defendant was convicted of three of the six charges against him. *Id.* On appeal, the defendant argued "that the state criminal prosecution against him was improper under the Supremacy Clause of the federal constitution." *Id.* (citing U.S. Const. art. VI, cl. 2). The defendant also contended that the district court erroneously concluded that it lacked the power to order restitution when the court instead sentenced the defendant to a prison term. *Id.* at 355, 732 P.2d at 882.

{8} In rejecting the defendant's contention that the Supremacy Clause barred the criminal proceedings against him, our Court recognized that "[t]he provisions of the Bankruptcy Act are not so intrusive so as to pardon a bankrupt from the consequences of a criminal offense." *Id.* at 354, 732 P.2d at 881. We further concluded that "[t]he filing by a defendant for bankruptcy or the obtaining of a discharge in bankruptcy does not void a restitution order imposed as a condition of probation under a state criminal judgment." *Id.* at 355, 732 P.2d at 882.

{9} As such, we reject Defendant's contention in his brief in chief that the restitution order was barred by the earlier bankruptcy proceeding. Defendant argues, however, that even if the restitution order was permissible, the initiation of criminal proceedings against him and the restitution order imposed by his sentence demonstrate that the State prosecuted Defendant solely to collect upon his debts. As such, Defendant asserts that the restitution order was "nothing more than an attempt to perform an end-run around the purposes of bankruptcy law" and should therefore be reversed.

{10} In support of his contention that the restitution order in the present case was improper, Defendant argues that because violations of the Securities Act do not require a demonstration of actual criminal intent, the State's only interest in prosecuting Defendant must have been to seek compensation for Defendant's victims. Moreover, Defendant asserts that the judge's comments while imposing restitution further demonstrate that the order was merely an end-run around the bankruptcy code. We reject Defendant's contention.

{11} "The purpose of federal bankruptcy law is to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Muzio,* 105 N.M. at 354, 732 P.2d at 881 (internal quotation marks and citations omitted). In *Muzio,* our Court recognized that the purpose of the bankruptcy code differed from that of the Worthless Check Act, which was "a statute created to punish an evil intent and an evil action." *Id.* Although we recognize that a specific intent to defraud is not required for conviction under the Securities Act, *see State v. Ross,* 104 N.M. 23, 26, 715 P.2d 471, 474 (Ct.App.1986), we disagree with Defendant's assertion that such a fact demonstrates that the only purpose behind prosecutions for violations of the Act is to obtain recompense for investors who lose money. As recognized by our Court,

The Securities Act, as a whole, has remedial purpose. It is comprehensive. Its extensive regulatory and administrative provisions are aimed at protecting investors against unfair, deceptive, and fraudulent practices in the sale of securities. . . .

The Act was written "with all encompassing strokes to protect the public," and to further "the legitimate governmental purpose of protecting the public from the many means promoters may use to separate the unwary from their money." In enacting the Act, our Legislature undoubtedly shared the legislative intent behind the Securities Exchange Act of 1934, which was "to insure honest securities markets and thereby promote investor confidence

... [and] to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry."

*Kirby*, 2003–NMCA–074, ¶¶ 23–24 (citations omitted). Thus, beyond protecting individual investors, the Act protects a number of important governmental interests, including preserving honest markets and investor confidence, encouraging full disclosure to investors, and maintaining high standards of business ethics among those dealing in securities. *See id.*

{12} Moreover, criminal penalties under the Act are permitted only where an individual "willfully violates" its provisions. *Id.* ¶ 32 (citing § 58–13B–39(A) ). Thus, the Act also serves to punish an individual for his or her willful or intentional behavior. *See Kelly v. Robinson*, 479 U.S. 36, 52, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) ("[T]he decision to impose restitution generally does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant."). "Society is benefited by punishment, including restitution, that is directly related to the offenses for which a defendant has been charged and convicted." *Cabla*, 6 S.W.3d at 545–46. We therefore reject Defendant's assertion that the sole purpose behind a criminal prosecution under the Act is to seek compensation for those harmed by Defendant's violations of the Act.

{13} Additionally, we reject Defendant's claim that the district court's comments during sentencing indicate that the criminal proceedings against Defendant were initiated in an attempt to perform an end-run around the bankruptcy code. At sentencing, the district court ordered Defendant to "make restitution on those ... notes that were identified for which [he] received a conviction." The district court further stated that it was awarding restitution "knowing that ... restitution is not highly likely." The court further stated, "I guess I hold out the hope that the [the victims] could receive something, and I think that anything they would receive would help their healing process."

{14} We fail to see how the district court's motivation in sentencing Defendant is in any way indicative of the State's initial decision to prosecute Defendant, even if we were to consider the State's motivation as a factor in determining the validity of a restitution order. *But see Cabla*, 6 S.W.3d at 549 n. 5 (indicating that such an inquiry is irrelevant). The district court's "statements do not go to the impetus behind the *prosecution* of appellant, but rather only address the trial judge's motivations during sentencing." *Id.* at 553 (Meyers, J., concurring). Significantly, the district court "has no input into a decision to initiate criminal proceedings against an accused. That decision lies exclusively with the State." *Id.*

 {15} Moreover, we do not believe that the district court's statements indicate an improper purpose behind the decision to order restitution. We observe that

> penal goals are accomplished through restitution to the extent that the defendant is forced to focus on the harm that was caused to the victim. Likewise, restitution is a monetary detriment to the defendant and satisf[ies] society's demand for meaningful justice, thus serving the punitive objective of the criminal system.

*State v. Garnett*, 384 Md. 466, 863 A.2d 1007, 1012–13 (2004) (internal quotation marks and citations omitted); *see State v. Palmer*, 1998–NMCA–052, ¶ 17, 125 N.M. 86, 957 P.2d 71 ("The purpose of the victim restitution statute is to remind the defendant of his wrongdoing and help to make whole the victim of the crime to the extent possible." (internal quotation marks and citation omitted)). The district court's remarks simply reiterated the general understanding that some of the purposes of restitution are to impress on a criminal defendant the consequences of his or her actions and to allow crime victims to heal and move on.

{16} Beyond the district court's own comments, Defendant does not present any evidence indicating that the State's primary motivation behind its decision to prosecute Defendant was to frustrate the purposes of the bankruptcy code. In the absence of any actual evidence bearing on the State's motives, we decline to make such an inquiry on our own. *See Muzio*, 105 N.M. at 354, 732

P.2d at 881 (declining to "look to the prosecutor's motives in commencing criminal proceedings" where the verdict is supported by sufficient evidence); *see also Cabla*, 6 S.W.3d at 552 (Meyers, J., concurring) (concluding that under *Muzio*, "the actual motivations of the prosecutor are irrelevant where the State can otherwise prove the elements of the crime"). We therefore affirm the district court's restitution order.

**Promissory Notes**

{17} Defendant next contends that his convictions of separate counts of securities fraud for each issuance of a promissory note, as well as each renewal or "rollover" of existing promissory notes, violated double jeopardy. Again, we disagree.

■ {18} "The Double Jeopardy Clause provides that no one will be 'twice put in jeopardy' for the same crime." *State v. Boergadine*, 2005–NMCA–028, ¶ 13, 137 N.M. 92, 107 P.3d 532 (citing U.S. Const. amend. V; N.M. Const. art. II, § 15). Of the protections offered by the Double Jeopardy Clause, the one most relevant to the case at bar is the protection against "multiple punishments for the same offense." *Swafford v. State*, 112 N.M. 3, 7, 810 P.2d 1223, 1227 (1991) (internal quotation marks and citation omitted). In multiple punishment cases there are two types of potential issues: "(1) multiple violations of the same statute, referred to as 'unit of prosecution' cases; and (2) violations of multiple statutes, referred to as 'double-description' cases." *State v. Armendariz*, 2006–NMSC–036, ¶ 20, 140 N.M. 182, 141 P.3d 526. Since Defendant is challenging his multiple convictions for violations of the same statute, we are presented with a unit-of-prosecution case.

■ {19} We analyze unit-of-prosecution cases in two steps. *State v. Bernal*, 2006–NMSC–050, ¶ 14, 140 N.M. 644, 146 P.3d 289. "First, we review the statutory language for guidance on the unit of prosecution." *Id.* (citation omitted). If the statutory language is clear with respect to the intended unit of prosecution, "then we follow the language, and the unit-of-prosecution inquiry is complete." *Id.* (citation omitted). "If the language is not clear, then we move to the second step, in which we determine whether a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments under the same statute." *Id.* (citation omitted). If we determine that Defendant's acts are not sufficiently distinct, "then the rule of lenity mandates an interpretation that the legislature did not intend multiple punishments, and a defendant cannot be punished for multiple crimes." *Id.* (citation omitted).

■ {20} Accordingly, to determine whether Defendant's charges violated double jeopardy, we must first identify the applicable unit of prosecution under Section 58–13B–30 of the Securities Act. Section 58–13B–30 provides that:

> In connection with the offer to sell, sale, offer to purchase or purchase of a security, a person shall not, directly or indirectly:
>
> A. employ any device, scheme or artifice to defraud;
>
> B. make an untrue statement of a material fact or fail to state a necessary material fact where such an omission would be misleading; or
>
> C. engage in an act, practice or course of business which operates or would operate as a fraud or deceit upon a person.

An individual who willfully violates the above provision may be subject to criminal penalties. *See* § 58–13B–39(A). We observe that the statute's provisions apply to "the offer to sell, sale, offer to purchase or purchase of *a security*." Section 58–13B–30 (emphasis added). Under Section 58–13B–30, the statutory language indicates a legislative intent that each offer to sell or sale of a security constitutes a separate unit of prosecution. *See State v. Baca*, 1997–NMSC–018, ¶ 9, 123 N.M. 124, 934 P.2d 1053 (observing that statutory language barring "knowingly issuing or transferring *a forged writing* with intent to injure or defraud" indicated "a legislative intent to make each act of forgery, each forged instrument, a separate offense"). The operative question becomes, therefore, whether the renewal or rollover of an existing promissory note constitutes an "offer to

sell, sale, offer to purchase or purchase of a security" under Section 58–13B–30. We conclude that it does.

{21} When a number of the promissory notes issued by Defendant to his patients became due, Defendant asked the patients to sign their notes "paid by renewal" and to mail the notes back to him. With such requests, Defendant included a new note with a new due date. The renewal notes ostensibly paid the old notes and constituted evidence of a new contract between the parties regarding the payment of Defendant's debt at a later date. *See* 10 C.J.S. *Bills & Notes* § 120 (1995) ("[I]t has been held that the execution of a renewal note constitutes a new contract evidencing the existing debt." (footnotes omitted) ). The noteholders' actions in deeming the old notes "paid by renewal" and mailing such notes back to Defendant constituted a discharge of Defendant's obligation to pay the notes. *See* NMSA 1978, § 55–3–604(a) (1992) ("A person entitled to enforce an instrument . . . may discharge the obligation of a party to pay the instrument . . . by an intentional voluntary act, such as surrender of the instrument to the party . . . or the addition of words to the instrument indicating discharge[.]"). The new note or renewal note sent by Defendant thus constituted a new offer to sell or sale of a security, which in some cases was refused by the respective noteholder. Since the sale of an original promissory note and the later offer to sell a new or renewal note seem to constitute separate units of prosecution under the Securities Act, Defendant's convictions for securities fraud in connection with both notes would not appear to violate double jeopardy.

{22} Even if the statutory language can be construed as ambiguous with respect to the renewal or rollover of promissory notes, we conclude that Defendant's actions were separated by sufficient indicia of distinctness such that his convictions do not violate double jeopardy. "Such indicia include the timing, location, and sequencing of the acts, the existence of an intervening event, the defendant's intent as evidenced by his conduct and utterances, and the number of victims." *State v. DeGraff,* 2006–NMSC–011, ¶ 35, 139 N.M. 211, 131 P.3d 61 (citing *Herron v. State,* 111 N.M. 357, 361, 805 P.2d 624, 628 (1991)). Notably, the renewal or rollover of existing promissory notes took place some time after the issuance of the original notes. Moreover, although the victims remained the same, the discharge of the original notes by signing them "paid by renewal" and the acceptance of new notes by the respective noteholders constitute new transactions between Defendant and the noteholders. We therefore believe that these events are separated by sufficient indicia of distinctness such that Defendant's convictions do not violate double jeopardy.

## Six–Month Rule

{23} Defendant next asserts that the district court improperly granted two three-month extensions of the six-month rule. *See* Rule 5–604(C). As such, Defendant contends that the district court should have granted his motion to dismiss for violation of Rule 5–604. We hold that Defendant waived the protections of the six-month rule.

{24} "Rule 5–604(B) of the Rules of Criminal Procedure provides that the trial of a criminal case shall begin within six months of the occurrence of the last of several events." *State v. Bennett,* 2003–NMCA–147, ¶ 14, 134 N.M. 705, 82 P.3d 72. In the present case, both parties agree that October 3, 2003, the date Defendant was returned to New Mexico after his arrest in Arizona for failure to appear, is the operative date from which to analyze whether the six-month rule was violated. *See* Rule 5–604(B)(6). Thus, in order to comply with the requirements of Rule 5–604(B), Defendant's trial needed to commence before April 3, 2004.

{25} Trial was set for March 22, 2004. On March 5, Defendant filed a motion for continuance and then stipulated to a second Rule 5–604 extension by the district court. By that time, however, the district court could no longer grant extensions under Rule 5–604, as it had previously granted a three-month extension on August 7, 2001. *See* Rule 5–604(C) ("[T]he time for commencement of trial may be extended by the trial judge provided that the aggregate of all extensions granted by the trial judge may not exceed

three (3) months."). On appeal, Defendant complains that the district court's second extension was in violation of Rule 5–604 and that his convictions should therefore be reversed.

{26} The underlying purpose of Rule 5–604 is to "assure the prompt trial and disposition of criminal cases." *State v. Flores,* 99 N.M. 44, 46, 653 P.2d 875, 877 (1982). However, "[t]he operation of the rule is not jurisdictional," and the rule is "to be applied with common sense and not used to effect technical dismissals." *State v. Guzman,* 2004–NMCA–097, ¶ 9, 136 N.M. 253, 96 P.3d 1173. Importantly, the rule is "not designed to allow a defendant to 'sleep upon' rights under the rule while the state continues 'prosecution of a case which is subject to being dismissed upon motion.'" *Id.* (quoting *State v. Vigil,* 85 N.M. 328, 332, 512 P.2d 88, 92 (Ct.App.1973)). As such, our courts have recognized that a defendant may waive the requirements of Rule 5–604. *Guzman,* 2004–NMCA–097, ¶ 13.

{27} We hold that Defendant's motion for a continuance and stipulation to the second Rule 5–604 extension erroneously granted by the district court constitutes a waiver by Defendant of the requirements of Rule 5–604. Although the district court had exhausted its extensions and the parties should have sought an extension of the rule with the Supreme Court, we believe that "[t]o allow a defendant to invite error and to subsequently complain about that very error would subvert the orderly and equitable administration of justice." *State v. Handa,* 120 N.M. 38, 45–46, 897 P.2d 225, 232–33 (Ct. App.1995) (internal quotation marks and citation omitted). Moreover, Defendant's acquiescence in the court's actions indicates that Defendant was not, at that point, concerned with his rights under the rule. *See State v. Lobato,* 2006–NMCA–051, ¶ 29, 139 N.M. 431, 134 P.3d 122; *Guzman,* 2004–NMCA–097, ¶ 13; *see also Bennett,* 2003–NMCA–147, ¶ 16 (concluding that a defendant's acquiescence to an extension of the rule constitutes a waiver of the rule's requirements). As such, we conclude that the six-month rule was not violated.

## Sufficiency of the Evidence

{28} Pursuant to *State v. Franklin,* 78 N.M. 127, 129, 428 P.2d 982, 984 (1967), and *State v. Boyer,* 103 N.M. 655, 658–59, 712 P.2d 1, 4–5 (Ct.App.1985), Defendant argues that the evidence is insufficient to support his convictions for securities fraud because the State did not prove that Defendant sold or offered to sell securities, as Defendant only borrowed money and provided promissory notes, not investments in his business.

{29} "When determining the sufficiency of the evidence, the court views the evidence in a light most favorable to the verdict, considering that the State has the burden of proof beyond a reasonable doubt." *State v. Garcia,* 2005–NMSC–017, ¶ 12, 138 N.M. 1, 116 P.3d 72. On appeal, we will not reweigh the evidence nor substitute our judgment for that of the fact finder provided that there is sufficient evidence to support the verdict. *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). After considering the facts in the light most favorable to the verdict, we must make a legal determination of "whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *State v. Apodaca,* 118 N.M. 762, 766, 887 P.2d 756, 760 (1994) (internal quotations marks and citations omitted).

{30} Defendant cites no authority in support of his assertion that promissory notes are not securities. Under the Securities Act, the term "security" includes notes. Section 58–13B–2(X). The understanding that "security" includes promissory notes has also been recognized by our courts. *See State v. Ramos,* 116 N.M. 123, 126, 860 P.2d 765, 768 (Ct.App.1993); *State v. Sheets,* 94 N.M. 356, 359–61, 610 P.2d 760, 763–65 (Ct. App.1980), *modified on other grounds by White v. Solomon,* 105 N.M. 366, 368, 732 P.2d 1389, 1391 (Ct.App.1986). We therefore reject Defendant's argument that the evidence is insufficient to support his convictions because promissory notes are not security under the Securities Act.

## Conflict of Interest

{31} Lastly, Defendant asserts that the district attorney's office should have been disqualified due to a conflict of interest. According to Defendant's testimony, an office manager at the district attorney's office previously worked for an attorney who had allegedly advised Defendant regarding the issuance of promissory notes. Defendant asserts that, because this created an impermissible conflict of interest, fundamental error dictates that his convictions be reversed.

{32} Since Defendant did not preserve this issue below, we apply fundamental error review. *State v. Lente*, 2005–NMCA–111, ¶ 12, 138 N.M. 312, 119 P.3d 737. "[T]he fundamental error doctrine is applied to review unpreserved error when the court's conscience is shocked at a miscarriage of justice, such as when a defendant is 'indisputably innocent' or when 'a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused.'" *Id.* (quoting *State v. Barber*, 2004–NMSC–019, ¶ 17, 135 N.M. 621, 92 P.3d 633). We conclude that there is no fundamental error in this case.

{33} At trial, Defendant elicited testimony from Kathy Tellez, an office manager at the district attorney's office, regarding her former employment with an attorney named Albert Rivera. Defendant asserts that Rivera and Tellez helped him prepare the promissory notes at issue in the present case. However, at trial, Rivera testified that he limited his practice to criminal law and workers' compensation cases and that he referred prospective clients to other attorneys for civil matters. Rivera further testified that he had never practiced banking or securities law. Rivera testified that he did not recognize Defendant's name and that he did not recognize Defendant sitting in the courtroom. Additionally, Tellez affirmatively stated at trial that Defendant had never been a client of Rivera's.

{34} Based on our review of the record, we do not find fundamental error in this case. As argued by the State, there is simply no undisputed evidence in the record indicating that Rivera was Defendant's attorney or that Tellez had any dealings with Defendant while she was employed by Rivera. Defendant's assertions alone are not sufficient to establish that a conflict of interest existed below. *Cf. State v. Foxen*, 2001–NMCA–061, ¶ 17, 130 N.M. 670, 29 P.3d 1071 (stating that "the jury was not obligated to believe [the d]efendant's testimony, to disbelieve or discount conflicting testimony, or to adopt [the d]efendant's view"). As such, we decline to reverse Defendant's convictions on these grounds.

## CONCLUSION

{35} We affirm Defendant's convictions and sentence.

{36} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge, and CELIA FOY CASTILLO, Judge.