Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# MEMORANDUM OPINION

No. 04-10-00924-CR

Larry Eugene **BERRY**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-CR-3461
Honorable Mary D. Roman, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:        Karen Angelini, Justice
                Phylis J. Speedlin, Justice
                Rebecca Simmons, Justice

Delivered and Filed:  May 9, 2012

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

Larry Berry appeals his convictions for misapplication of fiduciary property and theft, challenging the legal sufficiency of the evidence and the amount of restitution ordered. We affirm Berry's convictions, but reverse the portion of the judgment ordering restitution and remand to the trial court for recalculation of the appropriate amount of restitution.

**BACKGROUND**

During 2004 and 2005, Larry Berry ran a franchise of Budget Blinds in San Antonio, Texas. Berry independently owned and operated the franchise, while the corporate office in California provided sales, marketing, and technical support. Berry's business consisted of measuring for, ordering, and installing window blinds and shutters for homes and businesses in the San Antonio area. In late 2004, several customer complaints arose about Berry's business, with customers stating that Berry had taken their order and payment for blinds and/or shutters, but never delivered the blinds and/or shutters and could not be reached at the store or by telephone; the customer complaints increased during 2005. The Budget Blinds' corporate office terminated Berry's franchise in 2005, and eventually repaid some of Berry's customers for their undelivered orders. After his franchise was terminated, Berry continued operating his business under a new name, Blinds Depot. Berry continued taking orders and payment from customers, but did not deliver the window treatments that were ordered. Several customers reported the matter to the police, and a news story on Berry was aired as part of the "Troubleshooters" series on a local television network. The police investigation led to Berry's indictment on one count of aggregated misapplication of fiduciary property valued at least at $20,000 but less than $100,000, and one count of aggregated theft of lawful United States currency valued at least at $20,000 but less than $100,000; both counts involved the same forty-one victims. *See* TEX. PENAL CODE ANN. §§ 31.03(a), (e)(5), 32.45(b), (c)(5) (West Supp. 2011 & 2011); *see id.* at § 31.09 (West 2011) (permitting aggregation of amounts obtained pursuant to one scheme or continuing course of criminal conduct).

At the jury trial, thirty-two of the forty-one alleged victims testified they entered into an agreement with Berry to order and install blinds and/or shutters for their homes or businesses,

paid Berry at least 75%, in some cases 100%, of the purchase price by either cash or check, but did not receive their blinds and/or shutters.[1] The victims also testified that after Berry took their order and received payment, he did not return or answer their repeated phone calls and could not be found at the store. The jury found Berry guilty on both counts, misapplication of fiduciary property and theft. On November 30, 2010, Berry was sentenced to ten years' imprisonment on each count, to run concurrently, and was ordered to pay total restitution of $78,733.44 to the 32 victims listed on an attachment to the judgment. Berry now appeals.

## ANALYSIS

On appeal, Berry's first two issues challenge the legal sufficiency of the evidence to support his convictions, his third and fourth issues assert his convictions should be overturned due to his bankruptcy discharge, and his fifth issue contends the restitution order should be reformed because some victims were made whole by the Budget Blinds parent company or had their claims discharged in bankruptcy.

### *Legal Sufficiency*

In reviewing the legal sufficiency of the evidence, we determine whether, viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The standard applies equally to both direct and circumstantial evidence. *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000). In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Brooks*, 323 S.W.3d at 899.

---

[1] Some customers received partial delivery of blinds.

*Misapplication of Fiduciary Property*

In his first issue, Berry challenges the legal sufficiency of the evidence to support his conviction for misapplication of fiduciary property. A person commits the offense of misapplication of fiduciary property by intentionally, knowingly, or recklessly misapplying property he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property. TEX. PENAL CODE ANN. § 32.45(b). Count One alleged, with respect to each individual victim, that Berry did

> intentionally, knowingly, and/or recklessly misapply property, namely: lawful currency of the United States of America, having a value of . . . [dollar amounts varied per victim], that the defendant held as a fiduciary or as a person acting in a fiduciary capacity, contrary to AN AGREEMENT UNDER WHICH THE DEFENDANT HELD THE PROPERTY, and in a manner that involved a substantial risk of loss of the property to . . . the owner of said property . . . by failing to perform as specified in the agreement and/or by applying the property for purposes not related to the agreement with the owner.

Berry argues his conviction for misapplication of fiduciary property must be overturned because there is no evidence that (i) he was a fiduciary with respect to his customers' funds, or (ii) he misapplied any customer's funds.

Section 32.45(a)(1) defines a "fiduciary," in relevant part, as any person acting in a fiduciary capacity; the term "fiduciary capacity" is not defined. TEX. PENAL CODE ANN. § 32.45(a)(1)(C) (West 2011). In interpreting the meaning of an undefined statutory term, we apply the plain and ordinary meaning of the words, reading them in context and construing them in accordance with the rules of grammar and common usage. *Gonzalez v. State*, 954 S.W.2d 98, 103 (Tex. App.—San Antonio 1997, no pet.); TEX. GOV'T CODE ANN. § 311.011(a) (West 2005). The plain and common meaning of the term "fiduciary" is "'holding, held, or founded in trust or confidence.'" *Gonzalez*, 954 S.W.2d at 103 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 845 (1981)). Thus, a fiduciary is a person who has a duty, created by his own

undertaking, to act primarily for another person's benefit in matters connected with such undertaking. *Id.* (citing BLACK'S LAW DICTIONARY 625 (6th ed. 1990)); *Talamantez v. State*, 790 S.W.2d 33, 35 (Tex. App.—San Antonio 1990, pet. ref'd) ("fiduciary is one in whom another has justifiably reposed confidence to act in a certain manner"). A person receives money in a fiduciary capacity "'when the business which he transacts, or the money or property which he handles, is not his or for his own benefit, but for the benefit of another person as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.'" *Gonzalez*, 954 S.W.2d at 103 (quoting BLACK'S LAW DICTIONARY 625 (6th ed. 1990)). Within section 32.45, "misapply" means to deal with property contrary to an agreement under which the fiduciary holds the property. TEX. PENAL CODE ANN. § 32.45(a)(2)(A) (West 2011). The agreement need only be an understanding or arrangement as to a particular course of action; the agreement need not be written. *Bynum v. State*, 767 S.W.2d 769, 774-75 (Tex. Crim. App. 1989); *Gonzalez*, 954 S.W.2d at 104.

Here, each of the thirty-two victims testified that they had an agreement with Berry to order and deliver the blinds and/or shutters they chose, and that the money they paid Berry up front was for the specific purpose of ordering their window treatments, not for his own use or benefit. Thus, the evidence shows Berry was clearly acting as a fiduciary when he accepted his customers' money for the particular purpose of ordering their blinds and/or shutters, and pursuant to an agreement that the money was to be used for the benefit of the customers, not for Berry's own benefit. His customers trusted Berry to perform in accordance with their agreement, and Berry was aware of the trust they reposed in him; therefore, Berry was required to act in a fiduciary capacity with respect to his customers' funds. *See Talamantez*, 790 S.W.2d at 35-36 (insurance agent who accepted money to purchase automobile insurance acted in a fiduciary

capacity). The evidence showing that Berry dealt with his customers' money contrary to their agreement, and thus "misapplied" the money, consisted of the following: (1) the thirty-two customers' testimony that Berry never delivered their blinds and/or shutters (except for the three partial deliveries), avoided their calls, and never refunded their money; (2) the police investigator's testimony that Berry's bank records showed that he generally deposited customers' checks into his business account and then promptly transferred them to his personal account; Berry deposited an $8,000 check from Chris Elder for shutters into his business account, but transferred it into his personal account and used the money to pay for a new home he bought on Roan Bluff; Berry's business account had a negative balance in February and March 2005 before the bank closed the account; after March 2005, Berry no longer deposited customers' checks into the business account, but began cashing the checks at the customers' banks; and (3) the testimony of one customer, Chris Elder, who stated that Berry's mother danced around the store and exclaimed, "Woohoo, I'm going shopping" when Elder delivered the check for $8,000 to pay for her shutters, giving her the impression that her money was not going to go to her shutters. The jury was entitled to weigh and assess the credibility of all the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). There is legally sufficient evidence that Berry accepted his customers' money in a fiduciary capacity and dealt with the money in a manner contrary to his agreement with the customers, failing to deliver the blinds and/or shutters and transferring the payments to his personal account and using the money for his own benefit, thereby violating section 32.45(b). *See Talamantez*, 790 S.W.2d at 37; *Bynum*, 767 S.W.2d at 777 (evidence was legally sufficient to support finding that defendant misapplied property contrary to agreement

when he cashed and failed to account for checks given to citizen's committee for purpose of supporting bond election).

*Theft*

Berry was also convicted of theft in Count II, based on the allegation that he unlawfully appropriated the property he held as a fiduciary, i.e., the customers' money, for his own benefit. *See Talamantez*, 790 S.W.2d at 37 (discussing the difference between the offenses of misapplication of fiduciary property, which requires the defendant be in a position of trust and act contrary to the parties' agreement, and theft which requires that the defendant appropriate property for his own use). In his second issue on appeal, Berry argues his conviction for theft must be reversed because there is no evidence of deception, i.e., that he had the intent to deceive or deprive his customers of their money at the time of the transaction. Berry asserts the customers gave him their money with effective consent and their claims for nonperformance were merely a contractual dispute instead of a matter of theft. Count Two of the indictment charged Berry with committing theft from each victim, alleging that Berry

> with intent to deprive the owner . . . of property, namely: lawful currency of the United States of America, did unlawfully, without the effective consent of the owner, appropriate the property by acquiring or otherwise exercising control over the property, which had a value of [dollar amounts varied per victim] . . . , namely, a check dated [dates varied per victim] . . . payable to Budget Blinds/Larry Berry . . .

Section 31.03 of the Penal Code provides that a person commits the offense of theft if he "unlawfully appropriates property with intent to deprive the owner of property;" appropriation is unlawful when it is without the owner's effective consent. TEX. PENAL CODE ANN. § 31.03(a), (b)(1) (West Supp. 2011); *McClain v. State*, 687 S.W.2d 350, 353 n.7 (Tex. Crim. App. 1985) (to "appropriate" means any exercise of control over the property in question); *see Ehrhardt v. State*, 334 S.W.3d 849, 852 (Tex. App.—Texarkana 2011, pet. ref'd) (listing elements of theft).

Consent is not effective when it is induced by deception. TEX. PENAL CODE ANN. § 31.01(3) (West Supp. 2011); *Ehrhardt*, 334 S.W.3d at 853 (to "induce" means "to bring about, produce, or cause"). One means of deception is "promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed; the mere failure to perform, without other evidence of the actor's intent or knowledge, is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed at the time the property was taken. TEX. PENAL CODE ANN. § 31.01(1) (E) (West Supp. 2011); *Wirth v. State*, No. PD-1054-11, 2012 WL 931978, at *3 (Tex. Crim. App. March 21, 2012). Theft in connection with a contract requires proof that appropriation of the property was a result of false pretext or fraud, not merely that the defendant failed to return the property after failing to perform. *Wirth*, 2012 WL 931978, at *3; *Ehrhardt*, 334 S.W.3d at 853-54; *Jacobs v. State*, 230 S.W.3d 225, 229 (Tex. App.—Houston [14th Dist.] 2006, no pet.). In reviewing sufficiency of the evidence of this type of theft, the appellate court considers the events before, during, and after commission of the offense, as well as the defendant's actions which show an understanding and common design to commit the offense. *Wirth*, 2012 WL 931978, at *3; *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Berry argues there is no evidence he had the intent to deceive his customers when he accepted their money, i.e., he claims there was no false pretext and he intended to perform the contracts. He points to the evidence that all the customers voluntarily paid him in advance for their blind and shutter orders, and some received partial delivery of their orders, while most of the others were eventually repaid by the Budget Blinds parent corporation.[2] Berry asserts there is no evidence of deception on his part, or of a scheme to defraud, and excuses his conduct as "bad business practices" and "unfortunately typical of the economic times of the last ten years."

---

[2] The trial testimony was that 18 of the 32 victims who testified were repaid by Budget Blinds corporation.

Berry asserts his case is similar to *Phillips v. State*, 640 S.W.2d 293 (Tex. Crim. App. 1982), in which the court held the defendant's failure to perform a contract to build a home addition was insufficient to support his conviction for theft of the down payment. *Phillips* is distinguishable, however, because the holding was based on the absence of any evidence of deception by false impression of law or fact; it was a mere failure to perform. *Id.* at 294.

Here, by contrast, there is evidence in the record that supports a finding that it was more than just a simple failure to perform the contracts. There is sufficient evidence to support a reasonable inference that Berry promised performance of the contracts for window treatments in order to induce the customers' advance payment for the product, when he did not intend to perform or knew he would not be able to perform the contracts. There was evidence that Berry offered a discount to induce customers to pay by check or cash instead of by credit card. Many of the checks were made payable to "Larry Berry" alone, while the others were made payable to "Larry Berry/Budget Blinds" or "Larry Berry/Blinds Depot." Berry consistently demanded payment in advance for the orders – at least a 75% deposit, and in many cases 100% advance payment. In addition, Lisa Masterson with Timber Blinds Manufacturer testified that Berry had had an account with them since 2001, but it was closed in November 2004 due to nonpayment; at the time, Berry owed $46,000 to Timber Blinds, which amount was ultimately charged off. Masterson testified that, as of November 2004, Berry would have known that any orders he placed with Timber Blinds would not be filled. The evidence showed that before November 2004, Berry took a total of $16,640 from four of the thirty-two victims who testified (Chris Elder: $8,000; Beth Ann Enriquez: $6,200; Maria Vogt: $1,540; Yong Pak: $900). Therefore, Berry had knowledge that the customer orders he took after November 2004 would not be filled by Timber Blinds.

Only three of the thirty-two victims in this case received any window treatments at all from Berry – only partial deliveries of their orders; the other parts of their orders were never delivered by Berry. Every customer testified that once Berry received their payment, he became very difficult, if not impossible, to reach; he was not present in the store and would not return repeated phone calls. One customer even tried to contact Berry to change the color of her blinds, but could not reach him. None of the thirty-two customers received a refund from Berry, despite requests for refunds; instead, Berry blamed the delivery delays on manufacturing problems and the high humidity in Houston which delayed painting. Kristina Benca testified that when she investigated the status of her order with the manufacturer, she was informed that no order existed under her name or Berry's name. As noted, *supra*, Chris Elder testified Berry's mother indicated she was going shopping with Elder's $8,000 check for her wood shutters order. Berry's bank records showed that he did indeed use Elder's $8,000 check to pay for the purchase of a new home for himself.

While the customers voluntarily paid between 75% and 100% of the purchase price to Berry in advance, their payment was induced by and made in exchange for Berry's promise to order and deliver their blinds and/or shutters in accordance with their agreement; thus, their consent in handing over their money was not effective because they were induced by Berry's deception, i.e., his intent to deprive them of their money without performance of the contract. While some of Berry's practices, such as offering a discount for payment by cash or check, are not by themselves evidence of an intent to deceive, and are in fact common business practices, when viewed together with the other evidence of Berry's complete failure to perform on twenty-nine of the thirty-two contracts, his demands for payment up front, his excuses and avoidance of the customer once they paid for the order, his refusals to refund any payments, his bank records

showing he promptly transferred the payments to his personal account and used at least one payment for his own home purchase, and the large number of victims, all tend to support the jury's finding that Berry intended to deceive the victims at the time he took their money. *See Wirth*, 2012 WL 931978, at *3 (noting that, while the circumstantial evidence in that case "*could merely be [a] symptom[] of a 'previously successful business [falling] off' and 'scramb[ling] for money from … any available source,'*" the jury made a rational inference from the evidence that the defendant never intended to perform on the contracts and thus committed theft, and it was not the role of the appellate court to substitute its view of the evidence).

Accordingly, we overrule Berry's first two issues challenging the legal sufficiency of the evidence to support his convictions on Counts I and II of the indictment.

### Bankruptcy Discharge as Defense & Restitution

In his third and fourth issues, Berry asserts the bankruptcy court's discharge of his debts to customers who filed a proof of claim, and the absence of a fraud finding by the bankruptcy court, renders the evidence legally insufficient to support his theft conviction, and operates to collaterally estop his criminal prosecutions. In his fifth issue, Berry contends the restitution order should be reformed to reflect that some victims were repaid by the Budget Blinds corporation, and some who filed proofs of claim which were discharged in his bankruptcy proceeding; he contends other victims who failed to participate in his bankruptcy proceeding have "waived" their right to restitution.

In his brief, Berry cites to no authority holding that a discharge in bankruptcy collaterally estops or operates as a defense to a criminal prosecution, or bars a restitution order. In fact, the Court of Criminal Appeals has held to the contrary. In *Cabla v. State*, 6 S.W.3d 543, 549 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1092 (2000), the court held that a trial court could order

a defendant to pay restitution to his theft victims even though the sums had previously been discharged as debts in the defendant's federal bankruptcy proceeding. Berry acknowledges *Cabla*, but tries to distinguish it, arguing Berry's case is different because his victims' claims were repaid by the Budget Blinds corporation, and his bankruptcy petition was filed before he was convicted of the criminal offenses.[3] Berry also asserts the court's reasoning in *Cabla* is flawed, and urges us not to follow it. First, we are bound by the Court of Criminal Appeals holding in *Cabla*; secondly, we agree with its reasoning. The court based its holding on the "pervasive differences between the goals of the criminal justice system and the bankruptcy system," noting that a goal of restitution is punishment while the goal of bankruptcy is to permit an "honest and unfortunate debtor" to "begin his financial life anew." *Id.* at 545-48 (quoting *Kelly v. Robinson*, 479 U.S. 36, 46 (1986)). "As punishment, restitution attempts to redress the wrongs for which a defendant has been charged and convicted in court." *Id.* at 546 (citing *Martin v. State*, 874 S.W.2d 674, 678 (Tex. Crim. App. 1994)). Thus, a discharge in a civil bankruptcy proceeding has no effect on a criminal proceeding; its only effect is to extinguish the defendant's liability on any civil claim arising out of the debt.[4] *Id.* at 548-49 (that defendant's victims were named as creditors and bankruptcy court discharged defendant's debts prior to conviction had no impact on trial court's restitution order); *see United States v. Carson*, 669 F.2d 216, 217 (5th Cir. 1982); *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995).

---

[3] We may not consider the documents attached to Berry's brief, consisting of a printout with information about his bankruptcy case, because they were not presented to the trial court and are not part of the appellate record. TEX. R. APP. P. 34.1; *Ramirez v. State*, 104 S.W.3d 549, 550-51 n.9 (Tex. Crim. App. 2003); *Farris v. State*, 712 S.W.2d 512, 515-16 (Tex. Crim. App. 1986).

[4] The Bankruptcy Code expressly states that the filing of a bankruptcy petition does not stay commencement or continuation of a criminal action against the debtor. 11 U.S.C. § 362(b)(1) (2010); *see Smith v. Millsap*, 702 S.W.2d 741, 743 n.2 (Tex. App.—San Antonio 1985, no writ) (acknowledging section 362(b)(1)).

As to Berry's complaint concerning the amount of restitution ordered, we agree that because the record shows that more than half of the thirty-two testifying victims were made whole either by partial delivery of their orders or by repayment by the Budget Blinds corporation, the amount of restitution must be reduced.[5] *See Cabla*, 6 S.W.3d at 545 (restitution is intended to adequately compensate the victim of the offense in the course of punishing the criminal offender); *see also Campbell v. State*, 5 S.W.3d 693, 696 (Tex. Crim. App. 1999) (amount of restitution must be just and must have a factual basis within the loss of the victim); *Cartwright v. State*, 605 S.W.2d 287, 289 (Tex. Crim. App. 1980). Because there is no evidence to support the amounts of restitution ordered paid to those victims who have already been compensated for their loss resulting from Berry's offenses, the trial court abused its discretion by including those amounts in its restitution order for $78,733.44. *See Gonzalez*, 954 S.W.2d at 104-105. Therefore, we reverse the portion of the judgment ordering restitution, and remand to the trial court for recalculation of the appropriate amount of restitution.[6]

#### CONCLUSION

Based on the foregoing reasons, we affirm Berry's convictions but reverse the portion of the judgment ordering restitution in the amount of $78,733.44, and remand to the trial court for recalculation of the appropriate amount of restitution.


Phylis J. Speedlin, Justice

DO NOT PUBLISH

---

[5] The State did not address this portion of Berry's argument in its brief.

[6] Due to discrepancies between the record and the judgment as to the particular amounts lost by each victim, we are unable to calculate the appropriate amount of restitution and reform the judgment. *See* TEX. R. APP. P. 43.3.